UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                           )<br>)<br>COURTNEY WHITE,                    )<br>            Defendant         ) | Crim. No. 05-10143-PBS |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by and through its attorneys, United States Attorney Michael J. Sullivan and Assistant United States Attorney Paul R. Moore, hereby respectfully submits this Memorandum in opposition to Defendant COURTNEY WHITE'S Motion to Suppress Evidence.

**SUMMARY**

The defendant, in his Motion to Suppress Evidence, argues that any evidence seized during the search of his vehicle, as well as any statements made following his arrest, should be suppressed. More specifically, the defendant contends that the "pat frisk" and limited vehicular search conducted by Officer Frank Griffith violated his rights under the Fourth Amendment, and evidence obtained pursuant to those searches must be suppressed.

The government believes that the pat frisk and vehicular search were Constitutionally permissible and that the evidence seized and statements made following the defendant's arrest should, therefore, not be suppressed. The government maintains that the officers were justified in stopping the defendant for a traffic violation(s) and in asking the defendant to exit his vehicle. The government also believes that the pat frisk and the vehicular search were conducted as protective measures, and were both objectively and subjectively reasonable owing to the totality

1

of the circumstances. The government further contends that the seizure of the ski mask and the firearm it concealed was valid under the "plain view" doctrine. For these reasons, the government respectfully suggests to the Court that the search conducted by Officer Griffith was valid and that the Motion to Suppress should be denied in its entirety.

## STATEMENT OF FACTS[1]

On the night of January 4, 2005, Boston Police Officers Daniel MacDonald and Frank Griffith were patrolling in District Four, an area of Boston which includes the neighborhoods of Back Bay, the South End and Lower Roxbury. The officers were working in plain clothes and were driving an unmarked police cruiser, along with Boston Municipal Court Probation Officers John Turner and Tim Norris. The officers were traveling down Columbus Avenue in the South End, which was known to the officers as an area of intense drug activity and gang-related crime.

At approximately 9:05 p.m., Officer Griffith noticed a gray 1992 Toyota Corolla approaching them at an excessive speed and with its front left headlight out. The officers activated their emergency lights and initiated a routine vehicle stop on nearby Camden Street by confronting the vehicle head on. As he stepped out of the cruiser, Officer Griffith recognized the driver as COURTNEY WHITE, the defendant in this matter.

Officer Griffith had worked in District Four for nine years, and knew White from previous encounters. Officer Griffith knew and then believed that White was a convicted felon who lived in the area, and who was a member of a local gang (known to the police officers for its violent history in the area) called the "Massachusetts Avenue Hornets." For these reasons, Officer Griffith felt that White may pose a danger to the safety of himself and his fellow officers.

---

[1] Please see attached "Affidavit" of ATF Special Agent Lisa Rudnicki.

Accordingly, he asked White to turn off and exit the vehicle as he approached it. White complied, at which time Officer Griffith observed that there was no one else in the vehicle.

Once White had exited the vehicle, Officer Griffith conducted a pat frisk of White's person. During the pat frisk, Officer Griffith found a silver folding knife, which he confiscated. Officer Griffith then instructed White to move towards the front of his vehicle, though he did not then handcuff or otherwise physically restrain White. Having located a weapon (the knife) on White's person, and knowing White to be a convicted felon, Officer Griffith felt it necessary to perform a brief frisk of the front seat of the car in order to ensure officer safety. At this time, he observed a ski mask lying on the back seat. He identified the ski mask as one with eyelets and a nose hole. He opened the back door and picked up the ski mask. As he did so, a .32 caliber two-shot Derringer firearm fell out. Upon checking the firearm for safety purposes, Officer Griffith found it was loaded with live ammunition.

Throughout the stop and search, White acted in a manner which Officer Griffith found markedly unusual. Although White had remained aloof and uncommunicative during previous encounters with Officer Griffith, in this instance he was gregarious and apparently behaving oddly. White repeatedly asked Officer Griffith to be placed in the back seat of the cruiser, ostensibly so that his girlfriend would not see him. In addition, White continued pacing between the two vehicles in an attempt to move towards the cruiser. Given his thirty years of experience as a police officer, and further given his prior interactions with White, <u>Officer Griffith felt quite strongly that White was attempting to lure him away from his vehicle (White's vehicle)</u>.

After locating the firearm, Officer Griffith informed White that he was under arrest for possession of a firearm and ammunition, and also issued him a citation for driving at an

excessive speed and with a broken headlight. He advised White of his Miranda rights, handcuffed him and then brought him to the District Four Police Station. During the booking process, White stated to Officer Griffith that the gun was not his. He also stated that there had been other people in his vehicle earlier in the evening, and suggested that Officer Griffith had planted the gun in the vehicle. He later recanted this latter assertion, however, telling Officer Griffith, "Franko, I'm sorry. I know you didn't do that." White was then placed in a holding cell and again advised of his Miranda rights. At this point he stated that he did not want to speak with the officers and told them "I'll take my ten years."

## SUMMARY OF ARGUMENTS

The defendant argues that the arresting officers lacked reasonable suspicion to justify the pat frisk of his person. The defendant believes that the officers' knowledge of White's membership in an active gang known for its violence, his nervous demeanor aimed at luring the officers away from his vehicle, and the high incidence of crime in the area of the arrest are all insufficient to establish reasonable suspicion. *Commonwealth v. Heon*, 44 Mass. App. Ct. 254, 256-257 (1998); *U.S. v. McKoy*, 428 F.3d 38, 39 (2005). Lacking reasonable suspicion, the defendant contends that the pat frisk conducted by Officer Griffith was invalid.

Alternately, even if the pat frisk was valid, the defendant argues that the search of his vehicle was not. The defendant contends that the pat frisk did not establish the probable cause necessary to justify even a cursory search of the vehicle. *U.S. v. Maguire*, 918 F.2d 254 (1st Cir. 1990). The defendant also argues that the arresting officers had no reason to believe that White had committed a crime until Officer Griffith had conducted a search of the vehicle. White was not arrested until after Officer Griffith had found the firearm. Thus, the defendant argues that

the search was not conducted incident to a lawful arrest. Furthermore, defendant asserts that the firearm was not in plain view, but instead concealed beneath a ski mask, and its presence could therefore not serve as cause to search the vehicle. For these reasons, the defendant concludes that all evidence seized and all the statements made subsequent to his arrest must be suppressed.

The government respectfully takes the opposite view and believes that the search conducted by Officer Griffith was valid, and did not violate White's rights under the Fourth Amendment. The arresting officers were justified in their initial stop of the vehicle because it was traveling at an excessive speed and with a broken headlight. *U.S. v. Whren*, 517 U.S. 806 (1996). Once Officer Griffith had recognized White as a known felon and an active gang member in a gang known for its violence, he reasonably suspected that White may be dangerous, which permitted him to conduct a routine protective search of White's person. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). The discovery of the knife, along with Officer Griffith's knowledge of White's criminal background and gang activity, afforded him probable cause to conduct a limited protective search of White's vehicle. *U.S. v. Sharpe*, 470 U.S. 675 (1985). Additionally, Officer Griffith then believed that White was attempting to draw the officers away from his (White's car). That further raised Officer Griffith's suspicion that White was attempting to conceal something from the officers. The limited search resulted in Officer Griffith noticing, in plain view, a ski mask on the back seat. Aware from his experience that ski masks are occasionally used in robberies (although the government acknowledges other potential uses, particularly during the month of January), and in light of the surrounding circumstances, Officer Griffith then justifiably attempted to retrieve and examine the ski mask - thereby discovering the firearm . *Horton v. California*, 496 U.S. 128, 136 (1990). This examination of the ski mask

resulted in the exposure of a loaded firearm, which was then immediately seized. The government believes that each of the these actions were justified at their inception, and were reasonably related to the totality of the circumstances. Furthermore, the actions were both objectively and subjectively reasonable. The search conducted by Officer Griffith was, therefore, Constitutionally valid and the government believes that the evidence obtained pursuant to the search should not be suppressed.

**ARGUMENT**

**1.      The officers were justified in stopping White for a traffic violation and asking him to step out of the car.**

If an officer has probable cause to believe that a traffic violation has occurred, the decision to stop that vehicle is reasonable. *Delaware v. Prouse,* 440 U.S. 648, 659 (1979). In *U.S. v. Fox,* an officer stopped a vehicle for operating without a license plate light. 393 F.3d 52, 59 (1st Cir. 2004). There, the court found that "there was justification for stopping the vehicle to investigate, as the stop was supported by a reasonable and articulable suspicion that the vehicle was traveling in violation of a traffic law." *Id.* at 59. *See U.S. v. Chhien,* 266 F.3d 1, 5 (1st Cir. 2001) (traffic stop for tailgating and improper equipment led to valid consensual search).

Supplementing their decision in *Prouse*, the Supreme Court ruled in *Pennsylvania v. Mimms* that once a valid traffic stop has occurred, there is probable cause to ask the occupants to step out of the vehicle. 434 U.S. 106, 110 (1977). In balancing the interests of the police agencies to protect themselves against the privacy expectations of a driver, the Court held that the "additional intrusion can only be described as *de minimis*. The driver is being asked to expose to view little more of his person than is already exposed. . . .What is at most a mere inconvenience cannot prevail when balanced against legitimate safety concerns for the officer's

safety. " *Id.* at 111.

The officers here, like the officers in the *Fox* case, reasonably believed that White was driving in violation of a traffic law. They were therefore entitled to stop White's vehicle for the violation. The officers were also entitled to ask White to step out of the vehicle for their protection, as the Supreme Court ruled in *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977).

**2.  The pat frisk of White was valid under *Terry v. Ohio.***

In *Terry v. Ohio,* the Supreme Court ruled that it is permissible to stop and search a person as a protective measure, even if probable cause is lacking. In determining whether such a search is legitimate the Court applied a two-prong test. 392 U.S. 1, 19-20 (1968). The Court first considered whether the actions taken by the officer were justified at their inception; specifically, whether articulable facts and "reasonable inferences" drawn in light of experience reasonably warranted the intrusion. *Id.* at 21, 27. The Court then considered whether the actions were reasonably related to the circumstances, holding that a search is valid where an officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.* at 27.

Both prongs of the test articulated by the Court in *Terry* are satisfied in this case. The arresting officers had a valid and articulable reason for stopping White, since he was traveling at an excessive speed and with a broken headlight. Officer Griffith was justified in conducting a protective pat frisk of White because he knew from experience that White had a history of violent crime and was an active gang member. Furthermore, the pat down search conducted by Officer Griffith was reasonably related to the

circumstances then at hand: he knew that White was a criminal and a gang member, and thus had sufficient reason to believe that White may be armed and dangerous. A relatively noninvasive pat frisk is a routine method of ensuring that an individual is not armed. Thus, Officer Griffith pat frisk was reasonably related to the situation in which he found himself.

In light of the traffic violation and the fact that White was known to the officers as a violent criminal and a gang member, their actions satisfy the two-prong test articulated in *Terry*. The officers stopped White and conducted the pat frisk for an articulable reason and based on inferences drawn from their substantial experience. The pat frisk conducted by Officer Griffith was reasonably related to the circumstances. Thus, under *Terry*, the pat frisk conducted by Officer Griffith was valid.

**3.     The limited search of the vehicle was valid.**

    A.     The officers had a reasonable and articulable suspicion to search the vehicle.

In *Michigan v. Long*, the Supreme Court extended the protective search for weapons to include the passenger compartment and any areas within that compartment that could conceal weapons. 463 U.S. 1032, 1049-1050 (1983). Both the Supreme Court and the First Circuit have recognized that a valid traffic violation creates the required articulable suspicion necessary to justify a protective search for weapons. In *Whren,* the Supreme Court said "[t]he officers had probable cause to believe that petitioners had violated the traffic code. That rendered the stop reasonable under the Fourth Amendment." 517 U.S. at 819. In *U.S v. Nee*, the First Circuit ruled that "a possible traffic infraction . . . was legally permissible under the first prong of *Terry*." 261 F.3d 79,

83 (1st Cir. 2001). *See also U.S. v. Fox* 393 F.3d 52 (1st Cir. 2004).

Like the officers in *Fox,* the officers here were justified in their search of the vehicle because they stopped White for operating a vehicle with defective equipment. 393 F.3d at 56. This traffic violation created sufficient suspicion to perform an investigatory stop and search.

> B. <u>The totality of the circumstances justified the search of the vehicle for weapons.</u>

A protective search must be "reasonably related in scope to the circumstances which justified the inference in the first place." *U.S. v. Sharpe*, 470 U.S. 675 (1985). In doing so, the circumstances cannot be dissected and viewed individually. *U.S. v. Trullo*, 809 F. 2d 108, 111 (1st Cir. 1987). Rather, they must be considered as a whole, based on the totality of the circumstances. *Id. See also U. S. v. Cortez,* 449 U.S. 411, 417 (1981); *U.S. v. Gillard,* 847 F. 2d 21, 25 (1st Cir. 1998).

In looking at the totality of the circumstances, the first factor to consider in this case is Officer Griffith's recognition of White as a violent criminal and gang member. In *U.S. v. Fox*, the Court found that a previous arrest of a suspect was a relevant factor in finding that a search of a vehicle for weapons was valid. 393 F.3d at 59. *See also U.S. v. Scopo*, 19 F.3d 777 (2d. Cir. 1994). From previous interactions with White, Officer Griffith knew that White had the potential to be armed and dangerous. Indeed, in the current circumstances, he found that White was in possession of a knife. Accordingly, White's criminal background and membership in a local gang is a substantial relevant factor supporting the validity of Officer Griffith's search.

The location where the traffic stop took place is another significant factor to

consider. It was held in *Trullo* that officers may consider the characteristics of the area in which they encounter a vehicle when determining when to conduct a search. *Trullo*, 809 F.2d 108, 111. In this instant case, the arresting officers stopped White on Camden Avenue, which lies in an area known for drug activity and gang-related violence, and is part of the territory "claimed" by the Massachusetts Avenue Hornets. Thus, as in *Trullo*, the fact that the neighborhood in which the vehicular stop occurred was itself dangerous is a relevant factor favoring the validity of the search conducted by Officer Griffith.

A third articulable factor on which the officers justifiably could have relied was the appellant's conduct. *Trullo*, 809 F.2d at 112. In *U.S. v. Gilliard,* they ruled that the nervous conduct of the defendant can be a relevant factor in the decision to frisk for weapons. 847 F.2d at 25. *See U.S. v. Sowers* 136 F.3d. 24, 27 (officer's testimony that suspects acted nervously ruled a factor in finding that reasonable articulable suspicion existed); *see also U.S. v.* Fox 393 F.3d 52, (defendant's movements considered in determining that a search of a vehicle for weapons was valid); *U.S. v. Stanley* 915 F. 2d 54, 55. In this case, after White began acting in what Officer Griffith considered an unusual manner after exiting his vehicle - attempting to lure the officers away from his vehicle (through both words and physical movements). Officer Griffith had interacted with White on previous occasions and had always found him to be relatively quiet and aloof and saying very little. His behavior on this occasion was markedly different. He was jittery and anxious, and repeatedly asked to be placed in the back seat of the police cruiser - away from his own vehicle <u>well before the firearm was discovered</u>. He paced and ambled between the cruiser and his own vehicle, behavior which Officer Griffith

interpreted as an attempt to lure him away from the vehicle. For this reason, Officer Griffith suspected that White may be attempting to conceal incriminating evidence, which further validates his search of White's vehicle.

In assessing the totality of the circumstances, it is important to look at the facts as they would be viewed "through the eyes of a reasonable and cautious police officer." *Trullo*, 809 F.2d at 112; *see also Ornelas v. U.S.*, 517 U.S. 690, 699 (1996) (officer's experience and knowledge of drug trafficking significant in upholding a search of the interior of a car door). The officers based their decision to search the vehicle on the several factors: their immediate recognition of White, the location of the stop, White's apparent attempt to lure the officers away from his vehicle, and his carrying of a concealed knife. All of these factors created ample suspicion to justify a search of the scope that the officers conducted. The search took place while White was within a few feet of the vehicle. The officers searched only the area that would be immediately accessible by White upon his return to the vehicle. They did not then search under or between the seats, in the glove compartment or the trunk, all of which would have been permissible as well. By looking at these factors together, through the eyes of the trained officers, the search of the vehicle for weapons was reasonable.

Given the validity of the searches, it follows that White's subsequent statement of "I'll take my ten years," after having twice been advised of his Miranda rights, should not be suppressed.

4.   **White's removal from the immediate area of the vehicle during an investigatory stop was permissible.**

The Supreme Court in *Long* stated that location of a defendant during a protective search

of a vehicle is not relevant to its validity, which was in line with its decisions in *Chimel* and *Belton*. In *U.S. v. Chimel,* the Supreme Court ruled that a search incident to an arrest permissibly extends to areas where the arrestee might gain possession of a weapon or destructible evidence. 395 U.S. 752, 763 (1969). In *New York v. Belton,* the Supreme Court extended *Chimel* to include any open or closed containers found within the passenger compartment of a vehicle. 452 U.S. 454, 460 (1981). Supporting *Long*, the Supreme Court ruled again in *U.S. v. Taylor* that a search of a vehicle was permitted "even though the occupants had been secured and taken to the rear" of the vehicle. 162 F.3d 12, 20 (1998).

The Seventh Circuit has expanded this decision and allowed a protective search of a vehicle after the suspect had been placed in the back seat of the police vehicle. They ruled that even if the officer has no intention of allowing the suspect to drive the vehicle he may have been allowed to collect his belongings from the car, or in the alternative the suspect, "who sat un-handcuffed in the back of the patrol car, could have broken away." *U.S. v. Arnold,* 388 F.3d 237, 241 (7th Cir. 2004). This sentiment was echoed by the First Circuit in *Flowers v. Fiore*, when they ruled that a suspect that was handcuffed and placed in the backseat of the police vehicle during a protective sweep of his vehicle for weapons constituted a valid *Terry* stop. 359 F. 3d 24 (1st Cir. 2004).

As occurred in both *Long* and *Taylor*, White was moved to one end of the vehicle. He was not handcuffed like the defendant in *Flowers*, nor was he placed under arrest. While he may have attempted to move towards the police cruiser, this has no bearing on the legitimacy of the search. Even if he had been placed in the back of the vehicle, like the defendant in *Flowers*, the search would still have been a valid protective search.

**5.      The search was both objectively and subjectively reasonable.**

     A.      The officers had an objectively justifiable reason for conducting a search, in accordance with the standard adopted by the Supreme Court.

The Supreme Court has consistently ruled that in evaluating the reasonableness of a stop and search, the appropriate standard to apply is the objective standard. Beginning with *Terry*, the Court determined that the facts be judged against an objective standard when assessing the reasonableness of a stop and search. *Terry*, 392 U.S. at 21. The Court affirmed this principle in *Ornelas v. U.S.* There, it held that facts must be viewed from the standpoint of an "objectively reasonable police officer" when determining reasonableness. 517 U.S. 690, 696 (1996).

Law enforcement need not have an additional "reason to suspect foul play from the particular driver at the time of the stop." *Mimms,* 434 U.S. at 109. The subjective intention of law enforcement agents does not play into the equation of whether a stop or search is valid. As long as the stop is "objectively justifiable," as in a traffic violation, it is valid. *Whren*, 517 U.S. at 812.

> We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved . . . But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-causeFourth Amendment analysis.
> *Whren,* 517 U.S. at 813.

The First Circuit has followed the decisions of *Whren* and *Ornelas* in the recently decided case of *Bolton v. Taylor.* They reluctantly ruled that regardless of the officer's actual motivation, a *Terry* stop is valid if there are objectively reasonable suspicions of criminal activity. 359 F.3d 5, 8 (1st Cir. 2004). "*Whren's* 'objective' standard in Fourth

Amendment cases seemingly makes subjective motive irrelevant in all such cases." *Id.* at 10.

White here may assert that the officers' true reason for the stop and search was because of their recognition of White as a known felon in an attempt to find reason to arrest him. The intentions of the officers are irrelevant as they had an "objectively justifiable" reason for stopping White, the traffic violation of driving in the darkness with a headlight out and at an excessive rate of speed. *Whren,* 517 U.S. at 812.

> B.  The officers' intentions and perceptions satisfy the subjective standard adopted by the First Circuit for evaluating the reasonableness of a stop or seizure.

In *U.S. v. Lott,* this circuit adopted a subjective approach to viewing the objective circumstances. With regards to *Terry* and *Long,* the Court said "we do not read those cases as permitting a frisk, where, although the circumstances might pass an objective test, the officers in the field were not *actually* concerned for their safety." 870 F.2d 778, 783-784. (1st Cir. 1989). This decision appears to be in direct conflict with those of *Ornelas, Whren* and *Bolton*. Arguably, these cases overrule the decision in *Lott*. However, that need not be addressed as the officers here possessed the necessary subjective intentions required in addition to their objective suspicions.

The Court in *Lott* found that the officers were not in fear for their safety in ruling that search was impermissible. *Id* at 785. The evidence here shows that unlike *Lott*, from the beginning of the stop and throughout the search the officers were genuinely concerned with their safety and protection. The officers took all the proper steps to ensure their safety by asking White to step out of the car, pat frisking him and then pat

frisking the passenger compartment of the car for weapons. These steps show that the officers therefore met the necessary *Lott* requirements with regard to standards of subjectivity.

6. **The examination of the ski mask and consequent retrieval of the firearm from the back seat of White's vehicle was permissible under the "plain view" doctrine.**

If an item is in plain view and its incriminating value is immediate and apparent, it can be seized without a warrant. *Horton v. California,* 496 U.S. 128, 136 (1990). The officer must have "prior justification for being in a position to see the item." *U.S. v. Perrotta*, 289 F.3d 155, 167 (1st Cir. 2002); *see also U.S. v. Owens*, 167 F.3d 739, 746 (1st Cir. 1999). In addition, the value of the contraband is "immediate and apparent" if a reasonable person would believe that the contraband is evidence of a crime. *U. S. v. Hamie*, 165 F.3d 80, 83 (1st Cir. 1999).

The police had probable cause to examine or seize the ski mask because it was in plain view and the officers were in a justified position to see the it and its value was immediate and apparent. The officers had stopped White for routine traffic violations: specifically, traveling at an excessive speed and with a broken headlight. Thus, they were in a position that justified their viewing the ski mask, which was located in plain sight on the back seat of the vehicle. Likewise, while the evidentiary value of a ski mask found in a vehicle in New England during the winter might be questioned, a reasonable person might consider it evidence of a crime given the surrounding circumstances. White was known to the officers as a violent felon and an active gang member. He was found by Officer Griffith to be in possession of a knife, and unlike during previous interactions, he was talkative and nervous and seemed to be attempting to lure the officers away from his vehicle by repeatedly asking to be seated in the back of the cruiser, and by insisting that he did not want his girlfriend to see him in the presence of the police.

Furthermore, the officers were aware that ski masks are often used in robberies or burglaries. When weighed in relation to these factors, the incriminating value of the ski mask becomes "immediate and apparent." *Hamie*, 165 F.3d at 83. Thus, the examination of the ski mask by Officer Griffith, which revealed the presence of the firearm, satisfies the necessary criteria of the plain view doctrine.

## CONCLUSION

The search and seizure of the evidence here falls directly within the purviews of the *Terry/Long* analysis. The weapons were seized during protective searches by the officers at the scene. The officers' search of the vehicle was valid because they had a reasonable, articulable suspicion of criminal activity. Notwithstanding the protective search, the officers still had probable cause to search the vehicle for incriminating evidence. Based on the foregoing, the government respectfully submits that the evidence and statements were permissibly gathered by the police and that the defendant's Motion to Suppress should be denied in its entirety.

                                          Respectfully submitted,

                                          MICHAEL J. SULLIVAN
                                          United States Attorney

                            By:    /s/ Paul R. Moore
                                  Paul R. Moore
                                  Assistant United States Attorney

Date: June 1, 2006

## AFFIDAVIT

I, Lisa Rudnicki, being duly sworn, do depose and state as follows:

1. I am a Special Agent ("SA") of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have been a Special Agent with ATF for approximately ten years and during that time I have been involved in numerous investigations of federal firearms laws. I am currently assigned to a group in the Boston Field Division of ATF that, in part, works with the Boston Police Department to uncover violations of laws related to federal firearms, explosives and controlled substance laws in the City of Boston. Based upon my training and experience as an ATF Special Agent, I am familiar with federal firearms laws. I know that it is a violation of federal law for a felon to possess a firearm or ammunition that has traveled in interstate commerce.

2. I am submitting this affidavit in support of the government's Response to the Defendant's Motion to Suppress Evidence in the matter of COURTNEY WHITE ("White") for a violation of 18 U.S.C. §922(g)(1)(felon in possession of a firearm).

3. The facts stated herein are based upon my personal involvement in this investigation and my discussions with other law enforcement officers involved with this investigation. In submitting this affidavit, however, I have not included each and every fact known to me about the investigation.

4. On the evening of January 4, 2005, Boston Police Officers Frank Griffith and Daniel McDonald, accompanied by Boston Municipal Court Probation Officers John Turner and Tim Norris, were patrolling an area of Boston known for violent gang activity. They were traveling on Columbus Avenue when they observed a vehicle driving at an excessive rate of speed with

one of its front headlights clearly not working. The officers then conducted a stop of the vehicle on Camden Street and observed that it appeared to be a Toyota Corolla.

5. Upon making the stop of the vehicle, the officers immediately recognized its sole occupant as COURTNEY WHITE. They knew White from previous law enforcement encounters with him and knew him to be a violent felon (with a criminal record). Officers were also aware of his association with the Massachusetts Avenue Hornets, a gang that operates in this particular area and was known to the officers for its violence and other criminal activities.

6. For purposes of officer safety, the police asked White to step out of his vehicle. He complied with the request. Officer Griffith then approached White to conduct a pat frisk of him (and found a small knife on him). At about the same time, Officer Griffith noticed that White was consistently trying to move himself and the officers away from his car and he continued asking to be put into the back seat of the police cruiser. Officers found this behavior and request odd, particularly coming from a person who had been extremely quiet and reserved during their previous interactions. Officers knew from their experience that persons in White's position at that moment (prior to the discovery of the firearm) do not typically make such a request (to be placed in the cruiser). White mentioned to the police that he didn't want his girlfriend to see him, although her presence was not then known or otherwise apparent to the police. In fact, officers could see no other persons anywhere near the location of the stop.

7. After conducting the pat frisk and interacting with White, Officer Griffith conducted a frisk of the front seat area of the car and had also observed a black ski mask laying in the back seat. He could see that the ski mask had holes cut out for the eyes and the mouth, which then struck him as suspicious. He reached in to retrieve the mask and the firearm identified in the

Indictment in this matter fell out of the mask.

8. White was then placed under arrest and charged with possession of the firearm as well as being issued citations for the aforementioned traffic violations.

I hereby certify that the foregoing is true and correct. Executed this 1st day of June, 2006.

*[signature]*
Lisa Rudnicki, Special Agent
Bureau of Alcohol, Tobacco and Firearms