# James E. McCall

**ATTORNEY AT LAW**

**FOUR LONGFELLOW PLACE, SUITE 3703**
**BOSTON, MA 02114**
**(617) 720-2900**
**FAX: (617)742-5761**

July 27, 2006

The Honorable Patti B. Saris
United States District Court for the District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

> Re: United State of America v. Courtney White
>      Criminal No. 05-10143-PBS

Dear Judge Saris,

Enclosed please find copies of two cases, United States v. Lott, 870 F.2d 778 (1989) and United States v. Nee, 261 F.3d 79 (2001), which I did not cite in Defendant White's Memorandum of Law in Support of His Motion to Suppress Evidence Seized and Statements Made. I referenced both these cases in my oral argument on the issue of the second entry into the Defendant's vehicle and whether the police still had a reasonable legitimate fear for officer's safety at that time.

Very Truly yours,

James E. McCall

cc: Paul R. Moore , AUSA

West Reporter Image (PDF)

**FOR EDUCATIONAL USE ONLY**
870 F.2d 778

United States Court of Appeals,
First Circuit.
UNITED STATES of America, Appellant,
v.
George E. LOTT and Edward Turner, Defendants, Appellees.
No. 88-1739.
Heard Jan. 10, 1989.
Decided March 22, 1989.
As Amended March 28, 1989.

Driver and passenger of vehicle were indicted on charges of possession of firearms by felon and interstate transportation of stolen firearms. The United States District Court for the District of Massachusetts, Douglas P. Woodlock, J., suppressed evidence, including weapons, discovered during roadside search conducted after traffic violation, and Government appealed. The Court of Appeals, Bownes, Circuit Judge, held that: (1) Government was bound by its stipulation to defendants' standing to challenge search; (2) examination of driver's wrist by removing his bandage violated Fourth Amendment; and (3) _Terry_ did not justify search of interior of car for contraband. Affirmed.

West Headnotes

[1] KeyCite Notes 

⟸363 Stipulations
  ⟸363k14 Construction and Operation in General
   ⟸363k14(1) k. In General. Most Cited Cases

When Government has stipulated to standing, thereby obviating need for defendant to present facts relevant to standing, it may not thereafter claim defendant lacked standing on appeal.

[2] KeyCite Notes 

⟸363 Stipulations
  ⟸363k14 Construction and Operation in General
   ⟸363k14(1) k. In General. Most Cited Cases

Government could not raise issue of scope of stipulation as to defendant's standing to challenge search for first time on appeal where it had not asked for modification or rescission of stipulation below.

[3] KeyCite Notes 

⟸110 Criminal Law
  ⟸110XVII Evidence
   ⟸110XVII(I) Competency in General
    ⟸110k394 Evidence Wrongfully Obtained
     ⟸110k394.6 Motions Challenging Admissibility of Evidence
      ⟸110k394.6(1) k. In General. Most Cited Cases

Government could not claim that it lacked notice that defendant was seeking suppression of evidence discovered during search of his bandaged wrist, where defendant's motion specifically challenged search and seizure of his person and his effects and listed any blood samples, gauze or bandages among items to be suppressed.

[4] KeyCite Notes 

←48A Automobiles
  ←48AVII Offenses
    ←48AVII(B) Prosecution
      ←48Ak349.5 Search or Seizure Consequent to Arrest, Stop or Inquiry
        ←48Ak349.5(5) Object, Product, Scope, and Conduct of Search or Inspection
          ←48Ak349.5(9) k. Persons, Search Of. Most Cited Cases

Search of defendant's bandaged and bleeding wrist, after he was stopped for going through stop sign, could not be justified under "community caretaker" exception to Fourth Amendment, where any police concern about defendant's driving ability was negated by his otherwise unerratic driving, he was able to walk and converse in normal fashion, and police did not consider his wounds particularly severe, as evidenced by their decision to handcuff defendant and take him to station house following his arrest, rather than going immediately to hospital. U.S.C.A. Const.Amend. 4.

[5] KeyCite Notes 

←349 Searches and Seizures
  ←349I In General
    ←349k67 Weapons; Protective Searches
      ←349k68 k. Vehicle Searches. Most Cited Cases

Officer must have actual suspicion that weapons are present before *Terry* search can be conducted of interior of car; ex post facto reconstruction based upon argument of objective reasonableness cannot validate search where officers in fact have no such suspicion at time search is conducted. U.S.C.A. Const.Amend. 4.

[6] KeyCite Notes 

←48A Automobiles
  ←48AVII Offenses
    ←48AVII(B) Prosecution
      ←48Ak349.5 Search or Seizure Consequent to Arrest, Stop or Inquiry
        ←48Ak349.5(5) Object, Product, Scope, and Conduct of Search or Inspection
          ←48Ak349.5(10) k. Weapons; Protective Searches; Pat-Down. Most Cited Cases

Police were not justified in conducting *Terry* search of interior of defendant's vehicle after stopping his car for traffic violation, where police were not in fear for their safety, as shown by fact that neither defendant nor his passenger was frisked upon exiting car or at any subsequent time until their arrest, and the search was directed towards finding contraband, not weapons; police had no reason to suspect presence of firearms based on traffic violation of running stop sign and inconsistent statements made by driver and passenger regarding driver's bleeding and bandaged wrist did not provide reasonable suspicion. U.S.C.A. Const.Amend. 6.
**\*779** Paul V. Kelly, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief, for U.S.
Sharon Beckman with whom Andrew H. Good, by Appointment of the Court, Ann L. Strayer,

Silverglate, Gertner, Fine & Good, David L. Kelston, by Appointment of the Court, and Geller & Kelston, Boston, Mass., were on brief, for appellees.

Before COFFIN, BOWNES and SELYA, Circuit Judges.

BOWNES, Circuit Judge.
The United States appeals the district court's suppression of evidence prior to the trial of defendants, George Lott and Edward Turner. Both defendants were indicted on two counts: (1) possession of firearms by a felon, 18 U.S.C. § 922(q)(1); and (2) interstate transportation of stolen firearms, 18 U.S.C. § 922(i). The district court suppressed evidence, including the weapons, discovered at a roadside search because the search violated the fourth amendment and the teachings of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. We affirm.

I. FACTS

The facts are derived mainly from the district court's findings of fact which a review of the record shows are not clearly erroneous. Pelham, New Hampshire is a town in southern New Hampshire just over the Massachusetts border. At approximately 3:00 a.m. on March 9, 1987, Officer Andrew McNally and Special Officer Shawn Casey [FN1] of the Pelham Police Department noticed a car which failed to stop for a stop sign. The car was not speeding or otherwise driving erratically. Upon further inspection, the officers noticed that a rear tail light was broken, the license plate was hanging off slightly and the trunk was flapping. A check of the license plate revealed that the car was not stolen. When the car slowed down but did not stop for a second stop sign, the officers signaled for the car to pull over; the driver, defendant George Lott, complied.

FN1. A "special officer" is a part-time officer.

Once the cars were stopped, Lott exited the car and approached the police cruiser. McNally put the cruiser in reverse and told Lott to return to his car. Lott said "everything is all right," returned to his car and started to drive away. McNally then radioed to another car and took off after Lott. Lott was not speeding or otherwise attempting to evade the police. When he saw the two cruisers following him and signalling for him to stop, he did so.

Officer Evan Haglund, the sole officer in the second car, shouted to Lott and his passenger, defendant Edward Turner, to place their hands on the dashboard. They complied, and McNally approached the driver's side while Casey went to the passenger's side. While passing the open trunk, McNally looked in but saw nothing. On the back seat of the car he noticed a pair of bolt cutters. At some point a glass cutter was also seen. Upon reaching the driver's side of the car, McNally observed "blood pouring out of [Lott's] arm." McNally asked Lott for his license and registration. These were produced and were in order. McNally then asked Lott the cause of the injury. Lott stated that Turner's "bitching sister" had stabbed him with a fork. Turner then stated [FN2] that it was not his sister but rather a "whore" who stabbed Lott.

FN2. As the district court noted, there were discrepancies in the police officers' testimony as to these statements including whether Turner spoke in response to a question from the police or on his own.

Lott was ordered out of the car. McNally then removed, over Lott's protests, a **\*780** bandana covering one of his wounds [FN3]. The removal of the bandana was not for the purpose of looking for hidden weapons. Over Lott's further protests, an ambulance was called. While they waited, the officers placed bandages on Lott's wounds. Turner, who was still sitting in the car, was asked for identification. He produced a Massachusetts learner's permit and a social security card which were also in order. McNally, still in possession of both men's identifications, went back to his cruiser to check for outstanding arrest warrants.

FN3. As we point out *infra,* Lott was subsequently examined by ambulance personnel and after his arrest taken to a hospital. The testimony at the hearing and the reports by the ambulance and hospital personnel indicate that there were lacerations to both of Lott's wrists. Although the record is unclear as to which wrist, one was injured more severely than the other and was covered with a bandana.

When the ambulance arrived, Lott again stated that he did not want treatment--he wanted to see his own doctor. He signed a release to that effect and no treatment was administered--they merely rebandaged the wounds. While Lott was being examined by the ambulance personnel, Casey signaled to Haglund, the senior officer at the scene, and told him that he thought Turner was attempting to hide something behind his back. Haglund ordered Turner out of the car. A brown paper bag fell to the seat. Haglund opened the bag and found it contained an unopened full bottle of gin. After the bag with the gin was put back in the car, Turner moved to get back in but was prevented from doing so by Haglund. Haglund continued his search by looking under the car seats. He found a handgun and shouted to McNally that he had found a gun. The defendants were asked if they had permits. Receiving no satisfactory answer, the defendants were arrested for firearms violations. They were both handcuffed and read the *Miranda* warnings. Haglund then continued his search of the car and found three more handguns. The guns were not loaded and no ammunition was found. It was later ascertained that all four guns had been stolen that evening from a gun shop in northern Massachusetts.

After their arrest, the defendants were frisked for weapons and none were found. At no time prior to their arrest had they been frisked. At all times Lott was able to walk and talk normally and respond to requests appropriately. At no time prior to the arrest for firearms violations was a traffic citation given or an arrest for traffic violations made. [FN4] The total time that elapsed from the second stop to the arrest was approximately 10-12 minutes.

FN4. One arrest report indicates one of the three crimes Lott was arrested for was the stop sign infraction. Another report mentions only the firearms charges. The government did not contend below nor does it argue here that the search of the vehicle was a search incident to an arrest for a traffic violation. *See Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980) (where the fruits of the search are not essential to finding probable cause and an arrest follows quickly, a search incident to arrest may precede formal arrest).

Prior to trial, Lott and Turner moved to suppress all evidence and statements made during the stop including: the four weapons; glass and bolt cutters and other tools; blood samples and bandages; glass particles; and written and verbal statements. At a hearing on the motions, the government presented Officers McNally and Haglund as witnesses; the defendants called no witnesses.

The district court held that the initial stop of the car was justified and that the defendants were not subject to a *de facto* arrest requiring that the *Miranda* warnings should have been given earlier. It nonetheless held that the search of Lott's body (removing the bandana from his arm) and of the car violated the fourth amendment rights of the defendants because the police did not fear for their safety and thus, had no right to make the searches, relying on *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, and *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). The district court entered the following order:

I hereby ORDER that:

**\*781** (a) any evidence or observations of Lott's wound arising from Officer McNally's removal of the bandanna be suppressed at trial;

(b) any statements or information elicited after the search of Lott's wrist and deriving therefrom be suppressed as fruit of the poisonous tree; and

(c) that the four handguns seized beneath the passenger seat be suppressed.

## II. STANDING

Before we reach the merits, we must first address a preliminary issue. As the district court noted, "[t]

he government stipulated that both defendants have standing to move for suppression." [FN5] In its brief before this court, the government seeks to limit its stipulation; to what extent, however, is unclear. Basically, it contends that because fourth amendment rights are personal, standing cannot be stipulated.

> FN5. The colloquy at the outset of the hearing was as follows:
>
> MR. GOOD [Defendant Turner's attorney]: ... And for purposes of this hearing, the Government is going to stipulate that both Defendants have standing for purposes of the motion to suppress.
>
> THE COURT: All right. Is that the case, Mr. Kelly?
>
> MR. KELLY: Yes, that's a fair statement, your Honor....
>
> THE COURT: All right.
>
> MR. KELLY: Because we would want to just specify them a little more clearly for the record. But for purposes of this hearing, the Government concedes that both Defendants, who are charged with the crime of possession of firearms, certainly had a standing to challenge whether or not they were, in fact, in possession of those firearms.
>
> THE COURT: All right....

[1] [2] The government may not limit its stipulation for two reasons. First, when the government has stipulated to standing, thereby obviating the need for a defendant to present facts relevant to standing, it may not thereafter claim the defendant lacked standing. See _United States v. Hernandez,_ 668 F.2d 824, 826 (5th Cir. Unit B 1982); _but see United States v. Blanco,_ 844 F.2d 344, 349 n. 4 (6th Cir.), _cert. denied,_ 486 U S. 1046, 108 S.Ct. 2042, 100 L.Ed.2d 626 (1988). Second, the government never asked the district court for a modification or rescission of the stipulation. The government may not raise this issue for the first time on appeal. It is bound by its stipulation.

### III. THE SEARCH OF LOTT'S WRIST

In an apparent concession that the search of the cuts on Lott's wrist was not permissible under _Terry,_ 392 U.S. at 1, 88 S.Ct. at 1868, [FN6] the government on appeal relies on the "community caretaker" exception to the fourth amendment in contesting the district court's ruling on this point. This exception recognizes that police officers are often called to investigate situations "in which there is no claim of criminal liability," and such investigations begin "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." _Cady v. Dombrowski,_ 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). If in the course of such an investigation, evidence of a crime is discovered, the "better view" is that the evidence is admissible. _See_ W. LaFave, _Search and Seizure_ § 5.4(c) (2d ed. 1987). The government's reliance on this exception fails for two reasons.

> FN6. The search of Lott's bandaged arm cannot be considered a limited _Terry_ frisk for weapons. The purpose of the search was to inspect the wound, _not_ to disarm the defendant. At oral argument, the government admitted that the sole reason for ordering Lott out of the car was to examine his wound.

[3]    First, this basis for upholding the search was not raised below. "In the absence of extraordinary circumstances, none of which are apparent here, we have regularly declined to consider points which were not seasonably advanced below." *Clauson v. Smith,* 823 F.2d 660, 666 (1st Cir.1987) (collecting cases). The government claims that it was not aware that Lott was challenging the search of his body and that the judge *sua sponte* made this an issue. This claim is not borne out by the record. In his motion to suppress, Lott specifically stated that "the *search* and seizure *of his person* and effects was illegal, unreasonable, and ***782** unconstitutional,...." (Emphasis supplied). If this is not a clear statement that the search of Lott's wrist was contested, the list of specific items to be suppressed resolves any questions. Lott included "all blood samples taken from defendant or his effects, as well as gauze or any bandages applied to defendant." This is strong evidence that the search of the bandaged wrist was in dispute. The government cannot at this stage claim a lack of notice; it should have presented its theories for upholding the search below.

[4]    Second, even if we were inclined to reach the merits of this issue, the government would fare no better. Cases employing the "community caretaker" exception uniformly deal with situations where there is concern for the *public* safety due to the potential for danger to people or property. *See, e.g., Cady,* 413 U.S. 433, 93 S.Ct. 2523 (policeman was hospitalized following an accident; other police officers feared that his revolver, which was not on him and which might be in his car, could cause harm); *United States v. Singer,* 687 F.2d 1135, 1144 (8th Cir.1982) (upholding the warrantless search of a vacant house in which a burglary was presently suspected to be occurring), *adopted in relevant part on reh'g en banc,* 710 F.2d 431, 432 (1983); *United States v. Markland,* 635 F.2d 174 (2d Cir.1980) (recovery and inspection of packages with unknown contents following automobile accident), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2332, 68 L.Ed.2d 851 (1981); *United States v. Newbourn,* 600 F.2d 452 (4th Cir.1979) (upholding, under *Cady,* the warrantless search of a car trunk for which there existed probable cause to suspect it contained weapons following arrest of defendants); *United States v. Miller,* 589 F.2d 1117 (1st Cir.1978) (upholding search of abandoned boat for purposes of securing property and checking for possible injured persons), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *United States v. Nord,* 586 F.2d 1288 (8th Cir.1978) (police in investigating report that defendant had missed work and was intoxicated in his apartment entered apartment without a warrant).

The government claims that there was a reasonable fear for public safety here since a large loss of blood by Lott could have led to a loss of consciousness causing an accident and injuring Lott, his passenger and any number of others. The problem with such a claim is that with the exception of going through one stop sign and rolling slowly through another, there is no evidence that Lott was incapable of driving. Lott had driven at a normal rate of speed in an unerratic fashion, twice responding appropriately to signals to pull over. He was able to walk, converse in a normal manner and to state he wanted his own doctor. Indeed, the ambulance personnel did not find the situation life threatening—they allowed Lott to sign a release and refuse to accept treatment. Nor did the police find the wounds particularly bad—they handcuffed Lott, took him to the station house and only then to a hospital. There being no threat to the public's safety, the community caretaker exception does not apply. [FN7] Moreover, the police did not know that Turner, 39 years old, had only a Massachusetts learner's permit until *after* the search of Lott's wrist. If the police were solely concerned with Lott's driving ability, they should have first ascertained whether Turner was able to drive.

> FN7. The "emergency life-saving exception," *see United States v. Dunavan,* 485 F.2d 201, 203 (6th Cir.1973), is also not applicable since, as detailed in the text, there was no life threatening emergency.

## IV. THE SEARCH OF THE CAR

[5]  The government contends that the search of the car was valid under *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 which extended *Terry,* 392 U.S. at 1, 88 S.Ct. at 1868, to include automobile "frisks."

The police officers did not frisk the defendants prior to searching the car and arresting them. There was no evidence to suggest that the police had reason to believe that the defendants were armed or that there were weapons in the car. As Officer Haglund conceded on cross-examination, **\*783** the search was for contraband, not just weapons. Based on this, the district court found that the officers did not fear for their safety.

We recently stated:

In reviewing the reasonableness of a *Terry* stop, a court must consider all of the relevant circumstances, which are not to be dissected and viewed singly; rather they must be considered as a whole. Such review encompasses two inquiries: first, whether the officers' action was justified at its inception; and, second, whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place.

*United States v. Gilliard,* 847 F.2d 21, 24-25 (1st Cir.1988) (citations and quotations omitted), *cert. denied,* 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989).

In evaluating the propriety of a frisk for weapons, the Court has instructed:

The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Terry,* 392 U.S. at 27, 88 S.Ct. at 1883 (citations and footnote omitted). In the companion case to *Terry,* the Court further developed the requirements for a frisk:

The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.

*Sibron v. New York,* 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968). In *Long,* 463 U.S. 1032, 103 S.Ct. 3469, the Court extenced the area for which a valid *Terry* search could be made to include the interior of a car. If while conducting a valid *Terry* frisk, contraband other than weapons is found, the contraband is not subject to suppression. *Long,* 463 U.S. at 1050, 103 S.Ct. at 3481. But, The *Terry* case created an exception to the requirement of probable cause, an exception whose "narrow scope" this Court "has been careful to maintain." Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. *Nothing in Terry can be understood to allow* a generalized "cursory search for weapons" or, indeed, *any search whatever for anything but weapons.* The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked.

*Ybarra v. Illinois,* 444 U.S. 85, 93-94, 100 S.Ct. 338, 343-44, 62 L.Ed.2d 238 (1979) (citations and footnote omitted; emphasis supplied). Indeed, the reason that a generalized search for contraband is impermissible derives from the purpose behind a *Terry* frisk.

The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law.

*Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

Although *Terry* and *Long* speak in terms of an objective test ("reasonableness") for determining the validity of an officer's frisk for weapons, we do not read those cases as permitting a frisk where, although the circumstances might pass an objective test, the officers in the field were not *actually* **\*784** concerned for their safety. Indeed, this point seems to be implicit in the Supreme Court's reasoning. *See, e.g., Long,* 463 U.S. at 1049, 103 S.Ct. at 3480 (a search for weapons is allowed "if the *police officer possesses* a reasonable belief") (emphasis added); *id.* at 1051, 103 S.Ct. at 3482 (police may search if "*they possess* " a reasonable belief) (emphasis added); *id.* at 1052 n. 16, 103

S.Ct. at 3482 n. 16 (in order to search, "*the officer must have* an articulable suspicion") (emphasis added); *Ybarra*, 444 U.S. at 93, 100 S.Ct. at 343 (a frisk is permitted by the officer when "*he* reasonably *believes or suspects* " the detainee to be armed) (emphasis added). An officer cannot have a *reasonable* suspicion that a person is armed and dangerous when he in fact has *no* such suspicion.

Bolstering our conclusion that an officer must have an actual suspicion that weapons are present before a *Terry* search can be made are two further points. First, the Supreme Court and this court have consistently pointed to such facts. *See, e.g., Long*, 463 U.S. at 1036, 103 S.Ct. at 3473 (upon observing knife in car, officer frisked suspect and searched car for additional weapons); *Pennsylvania v. Mimms*, 434 U.S. 106, 107, 98 S.Ct. 330, 331, 54 L.Ed.2d 331 (1977) (per curiam) (officer performed *Terry* frisk fearing that bulge might be a weapon); *Williams*, 407 U.S. at 145, 92 S.Ct. at 1923 (officer was informed that suspect had a gun in his waist); *Terry*, 392 U.S. at 6, 88 S.Ct. at 1872 (officer feared the suspects might have a gun); *Sibron*, 392 U.S. at 46, 88 S.Ct. at 1894 (officer never suggested he searched out of a fear that suspect was armed and dangerous); *id.* at n. 4, 88 S.Ct. at 1874 n. 4 (same); *id.* at 64, 88 S.Ct. at 1903 (finding a *Terry* frisk invalid in part because officer did not fear suspect was armed and dangerous); *id.* at 21, 88 S.Ct. at 1879; *United States v. Trullo*, 809 F.2d 108, 110 (1st Cir.) (bulge in suspect's pocket), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987); *Ballou v. Massachusetts*, 403 F.2d 982, 985 (1st Cir.1968) ("the sole focus of suspicion here was that the suspects were armed"), *cert. denied*, 394 U.S. 909, 89 S.Ct. 1024, 22 L.Ed.2d 222 (1969). Second, where a search has been made without any legal basis, we do not think that an ex post facto reconstruction based upon an argument of objective reasonableness can validate the search. While other officers might have viewed the situation differently, it is the conduct of these officers which we are judging.

[6]   Applying these principles to the present case, we begin by examining whether the stop by the police was justified. It is undisputed that the police had good cause to stop the car: it had failed to fully comply with two traffic signs; its license plate was in disarray; and one tail light was out. "The foremost method of enforcing traffic and vehicle safety regulations, it must be recalled, is acting upon observed violations. Vehicle stops for traffic violations occur countless times each day; and on these occasions, licenses and registration papers are subject to inspection...." *Delaware v. Prouse*, 440 U.S. 648, 659, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660 (1979); *see also Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (analogizing routine traffic stops to *Terry* stops); *Mimms*, 434 U.S. at 109, 98 S.Ct. at 332.

The second prong of the analysis--whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place--is more difficult. The reason for the stop was a traffic violation. But, all facts gathered up to the time of the search of the car must be considered in analyzing the propriety of the search. *See Mimms*, 434 U.S. at 112, 98 S.Ct. at 334. The facts known to the police up to the point of the search of the car were: (1) the driver had failed to obey two stop signs; (2) the driver had driven away from one attempt to stop him; (3) the driver's wrists were bleeding; (4) the driver wished to leave and be attended by his own physician; [FN8] (5) the driver and passenger made **\*785** inconsistent statements concerning the wounds; (6) the passenger made an attempt to conceal something behind his back; (7) the "something" was a bag containing a full bottle of gin; and (8) the passenger made a move to return to the car. These facts do not point to any crime other than a traffic violation and any intrusion must be confined to that investigation or be based on the reasonable suspicion that the driver or passenger had weapons on them or weapons were in the car. The government repeatedly raises the spectre of the bolt cutters, glass cutters and other assorted tools. It fails, however, to explain how these tools of trade of many men are in any way suspicious. Such tools might have been suspicious had the police known of the gun store robbery earlier that evening and the means by which it was accomplished, but, here no such evidence was introduced. While the facts outlined above *might* be sufficient to justify the further search of the car under *Long*, here, three major reasons fatally undercut the validity of the search.

FN8. The government contends that the wounds were suspicious. If anything, the wounds are more indicative of Lott being a *victim* not a perpetrator of a crime. We also fail to see how Lott's reasonable request to leave and see his own physician is suspicious.

First, the police were not in fear for their safety. This is shown by the fact that neither defendant was frisked upon exiting the car (or at any subsequent time) until their arrest. If the police truly feared that the two were armed and dangerous or that Turner was concealing weapons by his movements, they would have made sure, by a *Terry* frisk, that the *defendants* were not armed and then have proceeded to search the car. *Cf. Long,* 463 U.S. at 1036, 103 S.Ct. at 3473 (upon seeing a knife in a car, police frisked suspect, who was outside of the car, first and then searched car). Thus, the claim that the police had a "reasonable" suspicion that the defendants were armed is belied by the fact that they were not frisked.

Second, the search was directed towards finding contraband. It was not a search for weapons only. This is improper under *Terry* and *Long.* The police may only conduct a *Terry/Long* search when looking for weapons. *Ybarra,* 444 U.S. at 93-94, 100 S.Ct. at 343-44 ("Nothing in *Terry* can be understood to allow ... any search whatever for anything but weapons.").

Third, though the facts might permit conflicting inferences, the choice to be made was for the district court. The findings of fact made by the court are supported by the record. We have no basis, therefore, for overturning the findings of the district court.

This is not a case where the police had reason to suspect the presence of firearms based on the type of crime suspected. The only reason for the stop was a traffic violation. *See, e.g., Terry,* 392 U.S. at 28, 88 S.Ct. at 1883 (robbery); *Gilliard,* 847 F.2d at 25 (drug trafficking); *Trullo,* 809 F.2d at 113 (drug trafficking and bulge in pocket). At the time of the search, the police officers did not know of the gun store robbery or the means by which it was accomplished.

As the district court found: "This was not a search animated by concerns for safety; rather it was driven by the understandable--but unconstitutionally applied--curiosity of a seasoned police officer." The court did not err in finding the search violative of the fourth amendment.

## V. CONCLUSION

The government is bound by its stipulation with respect to standing. The examination of Lott's wrist by removing his bandage and the search of the car were in violation of the fourth amendment. The suppression order entered by the district court is therefore

AFFIRMED.

The defendants' motion to strike portions of the government's appendix and brief is moot.

C.A.1 (Mass.),1989.

U.S. v. Lott

870 F.2d 778

END OF DOCUMENT

[PDF] West Reporter Image (PDF)

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

🕮 West Reporter Image (PDF)

CLERK'S OFFICE

**FOR EDUCATIONAL USE ONLY**
261 F.3d 79

2006 JUL 27  D 2: 25

**Briefs and Other Related Documents**

DISTRICT
OF MASS.

United States Court of Appeals,
First Circuit.
UNITED STATES of America, Appellant,
v.
Brian J. NEE, Defendant, Appellee.
United States of America, Appellant,
v.
Kevin M. Kelley, Defendant, Appellee.
Nos. 00-2037, 00-2315.
Heard April 3, 2001.
Decided Aug. 20, 2001.

Defendants charged with federal crime of possession of a firearm by a convicted felon moved to suppress two loaded weapons found during traffic stop of vehicle which one defendant was driving and the other defendant occupied as a passenger. The United States District Court for the District of Massachusetts, Nancy Gertner, J., granted motion. Government filed interlocutory appeal. The Court of Appeals, Lipez, Circuit Judge, held that: (1) District Court's finding that officer entered vehicle to conduct intentional search for evidence of a crime or contraband was not clearly erroneous; and (2) government waived claim that officers' subjective intentions in searching vehicle were irrelevant. Affirmed.
Torruella, Circuit Judge, dissented with separate opinion.

West Headnotes

[1] KeyCite Notes

🔑35 Arrest
   🔑35II On Criminal Charges
      🔑35k63.5 Investigatory Stop or Stop-And-Frisk
         🔑35k63.5(3) Grounds for Stop or Investigation
            🔑35k63.5(3.1) k. In General. Most Cited Cases

🔑35 Arrest KeyCite Notes
   🔑35II On Criminal Charges
      🔑35k63.5 Investigatory Stop or Stop-And-Frisk
         🔑35k63.5(9) k. Duration of Detention and Extent or Conduct of Investigation or Frisk. Most Cited Cases

In determining whether, in the absence of probable cause, an investigatory seizure and search violates the Fourth Amendment, court asks whether the officers' actions were justified at their inception, and second, whether their actions were reasonably related in scope to the circumstances which justified the officers' initial interference. U.S.C.A. Const.Amend. 4.

[2] KeyCite Notes

⟸35 Arrest
   ⟸35II On Criminal Charges
      ⟸35k63.5 Investigatory Stop or Stop-And-Frisk
         ⟸35k63.5(8) k. Justification for Arrest or Pat-Down Search. Most Cited Cases

Limited searches of a person for weapons are constitutionally permissible adjuncts to a *Terry* stop if a reasonably prudent officer in the circumstances would be warranted in the belief that his safety or that of others was in danger. U.S.C.A. Const.Amend. 4.

[3] KeyCite Notes 

⟸110 Criminal Law
   ⟸110XVII Evidence
      ⟸110XVII(I) Competency in General
         ⟸110k394 Evidence Wrongfully Obtained
            ⟸110k394.6 Motions Challenging Admissibility of Evidence
               ⟸110k394.6(4) k. Evidence on Motion. Most Cited Cases

District court's factual finding, on motion to suppress weapons found in defendant's vehicle, that officer entered vehicle to conduct intentional search for evidence of a crime or contraband in violation of the Fourth Amendment was not clearly erroneous, despite officer's uncontradicted testimony that knapsack containing weapons was located on floor of vehicle rather than under its seat and was discovered inadvertently while officer was trying to retrieve defendant's license. U.S.C.A. Const.Amend. 4.

[4] KeyCite Notes 

⟸110 Criminal Law
   ⟸110XXIV Review
      ⟸110XXIV(O) Questions of Fact and Findings
         ⟸110k1158 In General
            ⟸110k1158(4) k. Reception of Evidence. Most Cited Cases

The findings of the federal district court after a hearing on a pretrial motion to suppress are binding on the court of appeals unless they are clearly erroneous.

[5] KeyCite Notes 

⟸110 Criminal Law
   ⟸110XXIV Review
      ⟸110XXIV(O) Questions of Fact and Findings
         ⟸110k1158 In General
            ⟸110k1158(1) k. In General. Most Cited Cases

Where federal district court's evaluations of witnesses' credibility are concerned, court of appeals is especially deferential to the district court's judgment, and may overturn district court's decision only if, after reviewing all of the evidence, it has a definite and firm conviction that a mistake has been committed.

[6] KeyCite Notes 

⟸35 Arrest
  ⟸35II On Criminal Charges
    ⟸35k63.5 Investigatory Stop or Stop-And-Frisk
      ⟸35k63.5(8) k. Justification for Arrest or Pat-Down Search. Most Cited Cases

The purpose of a *Terry* search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. U.S.C.A. Const.Amend. 4.

[7] KeyCite Notes 

⟸110 Criminal Law
  ⟸110XXIV Review
    ⟸110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
      ⟸110XXIV(E)1 In General
        ⟸110k1028 k. Presentation of Questions in General. Most Cited Cases

Issues not squarely raised in the district court in a federal criminal prosecution will not be entertained on appeal.

[8] KeyCite Notes 

⟸110 Criminal Law
  ⟸110XXIV Review
    ⟸110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
      ⟸110XXIV(E)1 In General
        ⟸110k1044 Motion Presenting Objection
          ⟸110k1044.2 Sufficiency and Scope of Motion
            ⟸110k1044.2(1) k. In General. Most Cited Cases

Government's failure to preserve claim in its four legal memoranda objecting to suppression of weapons seized from defendant's vehicle, arguing pursuant to *Whren v. United States* that officers' subjective intentions in searching vehicle were irrelevant, constituted waiver; *Whren* was cited only in support of other propositions, and subjective motivations of officers were central to analysis in government's memoranda. U.S.C.A. Const.Amend. 4.

[9] KeyCite Notes 

⟸110 Criminal Law
  ⟸110XXIV Review
    ⟸110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
      ⟸110XXIV(E)1 In General
        ⟸110k1028 k. Presentation of Questions in General. Most Cited Cases

Arguments not raised in federal prosecution will be entertained on appeal only in horrendous cases where a gross miscarriage of justice would occur and, in addition, where the newly asserted ground is so compelling as virtually to insure appellant's success.
**\*81** Timothy Q. Feeley, Assistant U.S. Attorney, with whom Donald K. Stern, United States Attorney, and Donald L. Cabell, Assistant U.S. Attorney, were on brief, for appellant.
Brian J. McMenimen, with whom Burke, McMenimen & Payton, was on brief, for appellee Nee.
Benjamin D. Entine, with whom Donald K. Freyleue, was on brief, for appellee Kelley.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and LIPEZ, Circuit Judge.

LIPEZ, Circuit Judge.

Pursuing an interlocutory appeal "from a decision or order of a district court suppressing or excluding evidence," 18 U.S.C. § 3731, the government appeals the district court's decision to suppress evidence seized from defendants-appellees, Brian J. Nee and Kevin M. Kelley. Kelley and Nee were charged with violating 18 U.S.C. § 922(g)(1), which prohibits the possession of a firearm by a convicted felon, after police discovered two loaded weapons in Nee's car during the course of a traffic stop. Although the district court found that the initial stop was permissible under _Terry v. Ohio,_ 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the court rejected the police officers' account of the subsequent search of the car and their claim that the weapons were discovered inadvertently. Instead, the court found that the officers had conducted an intentional search for evidence of a crime despite their acknowledgment that they did not have probable cause for such a search. Consequently, the court concluded that the search violated the Fourth Amendment.

On appeal, the government argues that there was no constitutional violation, either because the district court erred in its factual findings about the purpose of the search, or, in the alternative, because the officers had an objectively reasonable basis for conducting a protective sweep of the car that justified the search irrespective of its true object, pursuant to _Michigan v. Long,_ 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), and _Whren v. United States,_ 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). We affirm, concluding that the court did not err in its factual findings and that the government waived its alternative argument.

**I.**

At approximately 9:30 p.m. on March 10, 1999, Boston Police Officers Gillis, Yalmokas and Cellucci, along with Massachusetts State Police Trooper Ball, were on duty in an unmarked car in the Dorchester section of Boston. The officers observed a green Ford Mustang and noted that: 1) there was a hole where the trunk lock should have been; 2) the rear license plate was hanging from a single screw; 3) there was no front license plate; and 4) the vehicle had dark tinted windows. Suspecting that the car might be stolen, the officers decided to stop the car and investigate it. Before they could, the car, driven by Nee with Kelley in the passenger seat and a third passenger, Brian Wallace, in the back, pulled into a gas station. The officers saw Nee exit the vehicle and begin to pump gas, and Kelley get out of the car from the passenger side.

The officers turned on their police lights and drove into the gas station. Trooper Ball approached Nee, offered a greeting, and advised him that the car he was driving had "no front plate, [a] rear plate hanging off, [a] trunk lock popped and windows [that were] too dark." In the exchange that followed, Nee stated that **\*82** the car belonged to his wife. Nee then tried to walk past Ball, indicating that his driver's license was in the vehicle. Ball told Nee to stop. According to the police report and Ball's testimony, Nee appeared nervous and agitated. He reported that his license was in the center console of the car but he was not sure where the registration was located. At this point, Nee again tried to walk past Ball toward the vehicle. This time, Ball physically stopped him and told him to relax, adding, "We don't know what you have in there." Officer Gillis, standing nearby, patted Nee down for weapons, and Officer Cellucci did the same for Kelley. No weapons were found.

Ball directed Cellucci to get Nee's driver's license from the center console. Before doing so, Cellucci frisked Wallace who was still seated in the back seat, and again, no weapons were found. Officer Cellucci told the passenger to get out of the car. He and Officer Gillis then visually inspected the car through the passenger and driver's side doors respectively before Cellucci entered the vehicle. Both saw a screwdriver located in the passenger door as well as some damage to the interior that was consistent with a stolen vehicle. [FN1] Gillis saw what looked like an ignition switch on the passenger side floor. Cellucci saw some damage to the steering column. After these quick observations, Cellucci entered the vehicle.

    FN1. Despite these indicia that the car might be stolen, the car in fact belonged to Nee's wife and was properly in his possession.

At this point the district court ceased to credit the officers' story. [FN2] Cellucci said that he had inadvertently discovered the guns when he entered the vehicle to retrieve Nee's license from the

center console, an account corroborated by Officer Gillis. According to the officers, Cellucci placed his hand on the top part of the passenger seat to steady himself as he reached into the car. The seat, however, was improperly bolted to the floor and gave way. As he was falling, Cellucci brought his other hand down to maintain his balance. It landed on a knapsack that Cellucci testified was lying on the floor in front of the seat. Cellucci claimed he could feel guns through the fabric when his hand landed on the knapsack. The officers subsequently arrested all three men.

> FN2. The district court initially found as fact in its order granting the motions to suppress that Officer Gillis had not confirmed the presence of a screwdriver or ignition switch on the passenger side of the vehicle. As the court acknowledged when denying Wallace's later motion to sever, see infra at 13 (discussing motion), that specific finding was erroneous.

The district court rejected this account of the discovery of the guns. After noting that neither Cellucci nor Gillis testified to having seen the knapsack when they visually inspected the interior of the car, the court concluded that the knapsack was not located on the floor in front of the seat as the officers had testified. Instead, the district court found that the officers had not mentioned seeing the knapsack because it was actually located underneath the passenger seat, and that Cellucci had conducted an intentional search of the vehicle for evidence of a crime. As part of this search, therefore, Cellucci pulled the knapsack out from under the seat and then discovered the weapons that led to the arrest of the three men.

Before trial, Nee, Kelley, and Wallace filed motions to suppress the two loaded firearms found in the knapsack. [FN3] The government **\*83** opposed the motions, raising Michigan v. Long in defense of Cellucci's entry into the car to retrieve Nee's license because of a concern that weapons might be in the vehicle. The district court concluded, however, that because Officer Cellucci conducted an intentional search for evidence of a crime, that search had to be justified by probable cause. Noting that the officers conceded a lack of probable cause, the court suppressed the guns as the fruit of an unconstitutional search. [FN4]

> FN3. The district court granted Nee's motion in an order dated June 16, 2000. However, the court afforded additional time to Kelley and Wallace so that they could submit memoranda concerning their standing to challenge the search of the car and the knapsack. In an order dated August 28, 2000, the court determined that Wallace lacked standing and denied his motion to suppress, but granted Kelley's motion on the same grounds as stated in its June 16 order. The government appealed both orders, and we consolidated the two appeals.

> FN4. The government does not challenge on appeal the district court's conclusion that the officers lacked probable cause to conduct a search of

the vehicle.

## II.

[KC]

[1] In determining whether, in the absence of probable cause, an investigatory seizure and search violates the Fourth Amendment, we use the two-prong test set forth in Terry v. Ohio, 392 U.S. 1, 19-20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). First, we ask whether the officers' actions were justified at their inception, and second, whether their actions were reasonably related in scope to the circumstances which justified the officers' initial interference. Id.; see also United States v. Sharpe, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); United States v. Stanley, 915 F.2d 54, 55

(1st Cir.1990). The district court concluded that the initial stop in this case--for "possible traffic infractions and [a] possible stolen car'--was legally permissible under the first prong of *Terry*. At issue, then, is only the second prong of *Terry*, namely, whether the ensuing search was reasonable in its scope. The government argues that *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), provides support for Cellucci's entry into the vehicle to obtain Nee's driver's license from the center console.

[2] **KC** Limited searches of a person for weapons are constitutionally permissible adjuncts to a *Terry* stop if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. *Long* expanded the permissible area of such a search from people to automobiles. *Long*, 463 U.S. at 1049, 103 S.Ct. 3469. Specifically, the *Long* Court held that a purely protective search of the areas of an automobile where weapons may be hidden does not violate the Fourth Amendment if the officers "possess[ ] a reasonable belief based on 'specific and articulable facts which ... reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of the weapons." *Id.* (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868).

By its own admission, the government did not anticipate that the district court would not credit the officers' "inadvertent" discovery description of the search of the vehicle. As a result, the government's argument before the district court that this case fell under *Long* was based upon the inadvertent discovery of the guns by Cellucci, following his entry into the vehicle for the limited purpose of retrieving the license. According to the government, this entry was valid as a protective search under *Long* because it allowed the officers to continue their investigation while also excluding Nee from an area that could possibly **\*84** contain weapons. When the district court rejected the officers' account of Cellucci's entry, however, it eliminated the factual predicate of this *Long* argument.

[3] **KC** [4] **KC** On appeal, the government seeks to revive this *Long* argument through a challenge to the district court's factual finding that Cellucci entered the vehicle to conduct an intentional search for evidence of a crime or contraband. "The findings of the district court after a hearing on a pretrial motion to suppress are binding on the court of appeals unless they are clearly erroneous." *United States v. Watson*, 76 F.3d 4, 6 (1st Cir.1996). "This deferential standard requires that an appellate court exhibit great respect for the presider's opportunity to hear the testimony, observe the witnesses' demeanor, and evaluate the facts at first hand." *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir.1994). The government seeks to clear this high hurdle through a series of attacks upon the district court's credibility determinations. Making much of the fact that no witnesses contradicted the officers' account of the discovery of the knapsack and guns and that there was no direct evidence supporting the finding that the knapsack was under the seat, the government argues that the district court's conclusion that Cellucci's testimony lacked credibility was clearly erroneous.

[5] **KC** The government's arguments, however, are unpersuasive. "Where evaluations of witnesses' credibility are concerned, we are especially deferential to the district court's judgment; we may overturn its decision only if, after reviewing all of the evidence, we have a definite and firm conviction that a mistake has been committed." *United States v. Jones*, 187 F.3d 210, 214 (1st Cir.1999) (internal quotation marks omitted). Despite the court's minor error in reporting what Officer Gillis saw upon looking into the vehicle, *see supra* note 2, the record as a whole lends support to the court's credibility determinations.

Officer Gillis testified that he saw an ignition switch on the passenger side floor of the vehicle. This was precisely where Cellucci claimed the knapsack was located, yet Gillis did not mention seeing the knapsack until after Cellucci had placed his hand on it. The district court also questioned the need for Gillis to assist Cellucci in his efforts to retrieve a license from a now empty car, noting that "[i]t did not take two officers, Gillis 'leaning' from the driver's side, Cellucci 'leaning' from the passenger's side, to retrieve Nee's driver's license from the center console of the car." Moreover, the officers could have called in the license plate of the car to determine if it had been reported stolen or to check whether Nee was telling the truth when he said the car belonged to his wife, thereby addressing the suspicion that the officers testified prompted the stop of the car. Instead, the officers pressed forward with Cellucci's entry and search of the vehicle. In light of such evidence, we do not have the necessary basis--a "definite and firm conviction that a mistake has been committed"--for rejecting the court's credibility determinations. *Jones*, 187 F.3d at 214 (internal quotation marks omitted); *Jackson*

["

entertained on appeal." _United States v. Barnett,_ 989 F.2d 546, 554 (1st Cir.1993). This "raise-or-waive rule prevents sandbagging; for instance, it precludes a party from making a tactical decision to refrain from objecting, and subsequently, should the case turn sour, assigning error (or, even worse, planting an error and nurturing the seed as insurance against an infelicitous result)." _United States v. Taylor,_ 54 F.3d 967, 972 (1st Cir.1995). Upon careful examination of the government's arguments below, we conclude that the district court, from its superior vantage point, correctly observed that the government failed to preserve its alternative _Whren_-based _Long_ argument.

[8]    The government filed four legal memoranda objecting to suppression of the evidence seized pursuant to the search of Nee's vehicle. Although the cornerstone of the government's claim on appeal as to the irrelevance of the officers' subjective intentions is the purported conflict between _Whren_ and _Lott,_ that conflict is not mentioned in any of these memoranda. Indeed, the government cites to _Whren_ only twice, both times for the simple proposition that the officers could stop the vehicle and order the occupants out of the car. Though _Lott_ is discussed, the government only distinguishes the facts in that case from the facts here as the officers presented them, rather than attacking the legal principles underlying the _Lott_ holding. [FN6]

> FN6. Even on appeal, the government's attack on _Lott_ has the flavor of a work in progress. In its principal brief, the government claims in a footnote that the "extent to which _Lott_ remains viable after _Whren_ is obviously suspect." Despite the fact that _Lott_ is directly on point and controlling precedent unless _Whren_ does overrule it, _see, e.g., United States v. Wogan,_ 938 F.2d 1446, 1449 (1st Cir.1991) ("We have held, time and again, that in a multi-panel circuit, prior panel decisions are binding upon newly constituted panels in the absence of supervening authority sufficient to warrant disregard of established precedent."), the government waited until its reply brief to argue explicitly that _Lott_ is no longer good law.

Moreover, there is nothing in the memoranda that serves as an equivalent to the alternative argument the government now presses on appeal. Though the government does suggest that the officers were entitled to perform a full search of the car for weapons, this suggestion is based upon the officers' subjective motivations, as they were expected to testify to them. Indeed, the subjective motivations of the officers are central to the analysis in the government's memoranda. The government never argues that these subjective motivations are irrelevant or that the district court should ignore the officers' subjective purpose and undertake an objective analysis of the facts. "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." _United States v. Zannino,_ 895 F.2d 1, 17 (1st Cir.1990) (internal citations and quotations omitted).

[9]    Although the raise-or-waive rule is not absolute, "it is relaxed only in extreme cases. Arguments not raised below will be entertained on appeal only in horrendous **\*87** cases where a gross miscarriage of justice would occur and, in addition, where the newly asserted ground is so compelling as virtually to insure appellant's success." _United States v. Haggert,_ 980 F.2d 8, 11 (1st Cir.1992) (internal quotation marks omitted); _see also United States v. Ramirez-Rivera,_ 241 F.3d 37, 40 (1st Cir.2001). This is not an exceptional case, despite the government's claim that it "could hardly be expected to have anticipated (or invited) the district court's adverse credibility determinations and factual findings," and hence the need to argue in the alternative. We reject this claim. District courts routinely find facts and make credibility determinations during suppression hearings. No party is immune from the possibility that those credibility judgments will be adverse. If the government had an argument, as it now claims it does, that would justify the search of Nee's vehicle no matter what credibility determinations the court made about the purpose of Cellucci's search, the onus was on the government to press that argument in the first instance. Not having done so, the government cannot raise it for the first time on appeal.
**Affirmed.**

TORRUELLA, Circuit Judge, dissenting.

The *Michigan v. Long* standard is clear: a protective area search of the car is constitutional as long as the police officers can point to "specific and articulable facts which ... reasonably warrant [them] in believing that the suspect is dangerous and the suspect may gain immediate control of the weapons." 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). This Court has held that the *Long* test is subjective, rather than objective. *United States v. Lott,* 870 F.2d 778, 783-84 (1st Cir.1989) (highlighting the requirements that the officers "possess" a reasonable fear that their safety has been compromised and that they "believe" and "suspect" that the detainee is armed). [FN1] Consequently, under First Circuit law, a *Long* search passes Fourth Amendment scrutiny only if the officers in the field were *actually* concerned for their safety. *Lott,* 870 F.2d at 784. Because I believe the district court did not analyze the facts using this standard, I would remand this case for further factual findings.

> FN1. *But see United States v. Menard,* 95 F.3d 9, 11 (8th Cir.1996); *United States v. Baker,* 47 F.3d 691, 694 (5th Cir.1995).

At the suppression hearing, Officer Cellucci stated that he entered the car for the sole purpose of retrieving Nee's license. Cellucci testified that while he was reaching to the center console, the passenger seat gave way, causing him to "inadvertently" discover the weapons inside the knapsack. The district court discounted this testimony, finding Cellucci's account "simply not credible." Instead, it found that Cellucci intended to search the car when he entered it. The district court made no further finding concerning the purpose of the search. A protective area search under *Long* is consistent with these findings. That is, even if the officers lied about entering the car to retrieve Nee's license and were in fact conducting an intentional search for weapons, *Long* permits such an intentional search if the officers believed that the suspects might have access to weapons located therein. The question for the court, then, was whether the officers did in fact possess a reasonable **\*88** fear for their safety. [FN2]

> FN2. Given that the officers conceded from the outset that they had
>
> no probable cause to search the car, moreover, the *Long* analysis appears to be the only analysis pertinent to this case.

The majority, however, infers from the district court's opinion that the search was for contraband, not weapons, thereby rendering a *Long* analysis irrelevant. *See Lott,* 870 F.2d at 785 (concluding that search was improper because it "was not a search for weapons only"). Although the opinion contains no such explicit finding, the majority concludes that this inference is the only way to explain the district court's focus on probable cause, rather than on *Long.* In other words, *because* the court conducted only a probable cause analysis, and since a search for contraband can only be justified by probable cause, the majority believes the district court must have concluded, *sub silentio,* that the search was for contraband. The majority thus assumes that the district court had the *Long* argument in mind while conducting its probable cause analysis, and uses an inferred factual finding to reconcile any possible contradiction. While I normally might be inclined to give the district court such a benefit of the doubt, I am unwilling to do so in this case for the following reasons.

First, the inferred factual finding cannot be squared with the record, which suggests that the officers consistently suspected that the car contained weapons. It is uncontested that upon entering the scene, the officers frisked all of the defendants. *Cf. Lott,* 870 F.2d at 785 (noting that the officers' failure to frisk suspects after they exited the vehicle demonstrated that they did not fear for their safety). In fact, Officer Cellucci's first action upon entering the vehicle was to frisk the third occupant of the car and to ask him to exit the vehicle. Significant as well is Officer Ball's reason--found in the contemporaneous police report as well as the hearing transcript--for not letting Nee back in the car. Ball testified various times that he did not want Nee to enter the car because he "did not know what [Nee] had in there." Officer Gillis shared this concern, stating, "We didn't know if there was [sic] any

weapons or anything that could be used to hurt us in that vehicle." Furthermore, after asking Cellucci to retrieve Nee's license, Ball asked Nee to step to the rear of the vehicle. Ball later testified that "for [reasons of] officer safety, [he] wanted [Nee] at the back of the car so that [he] could watch him and watch the two officers in the car." All of these measures attest to the officers' subjective belief that weapons, not contraband, were located in the car. Nevertheless, the majority's reading of the district court opinion suggests that upon entering the vehicle, this fear simply vanished and the officers were suddenly motivated to "find evidence of a crime," presumably that the car was stolen. [FN3] Even if the court did conclude, *sub silentio,* that the officers were searching for such evidence, I believe this conclusion requires explicit justification by the district court given the record in this case.

   FN3. Interestingly, the majority, like the district court, suggests that the officers' suspicion was pretextual, noting that if they *really* believed the car was stolen, they "could have called in the license plate of the car to determine if it had been reported." It is paradoxical that a disingenuous suspicion could constitute the main focus of the subsequent search.

Second, other aspects of the district court's opinion tend to support a conclusion that the officers had a reasonable fear for their safety. For example, in its conclusions of law, the court states that "where [the officers'] suspicions went beyond *\*89* traffic violations, they had a right to be concerned about weapons." Earlier in that same paragraph, the court acknowledges that the officers had the right to conduct an investigatory stop for a "possible stolen car." Similarly, the decision indicates that "[i]f the officers were concerned about weapons, they could have ordered the occupants out of the car." It is plain from the facts that two of the occupants were already outside of the car when the stop occurred, and the third was frisked and ordered out of the car before the search began. Once again, if the court did in fact conclude that the officers were motivated to look for evidence of a crime, rather than by a concern for their own safety, the district court's other, contradictory conclusions require further explanation.

Finally, I am concerned by the fact that the *Michigan v. Long* argument, although raised in the district court, is not so much as cited in the district court's orders. As the hearing transcript reveals, it was also not addressed orally. [FN4] Even if a finding that the officers intended to search for contraband might invalidate an otherwise legal protective area search under *Long,* [FN5] it does not absolve the court from addressing the ultimate issue in the analysis, namely, whether the officers actually feared for their safety. *See, e.g., Lott,* 870 F.2d at 784 (taking into account "all facts gathered up to the time of the search" *before* deciding that the search was "fatally undercut" due to the officers' improper motivations). Only when the court considers the legal theories raised by the parties below and has addressed the implications of its own factual findings upon them can this Court properly review the decisions appealed therefrom.

   FN4. The only reference to *Long* occurred in the colloquy regarding

   standing, during which the court stated, "[The officers are] not even suggesting that they had probable cause to search the car, and they're not suggesting that they had probable cause to, quote, frisk the car, whatever that means, to look for weapons." An "automobile frisk," of course, is a common way of referring to protective area searches under *Long. See Lott,* 870 F.2d at 782. The court's cursory dismissal of this theory, along with its apparent association of this type of search with an incorrect standard reflects, in my opinion, some confusion on the part of the court between a probable cause analysis and the *Long* analysis urged by the government, and is a further reason I disagree with the inference constructed by the majority.

   FN5. This is the paradigm suggested by *Lott,* though it was not squarely addressed since in that case, this Court found that the officers did *not* exhibit a fear for their safety *in addition to* having an improper motivation for the search. *Lott,* 870 F.2d at 785. At least

one case on point has concluded otherwise. *See, e.g., United States v. Gonzalez, 954 F.Supp. 48, 50 (D.Conn.1997)* ("[The officer's] statement in the incident report that he believed the car contained narcotics is not inconsistent with his testimony that he feared he could be shot.").


To conclude, I believe that the district court failed to complete its analysis below by neglecting to determine whether the officers' intentional search was nevertheless a permissible area search under *Michigan v. Long.* For this reason, I would remand this case for further findings in that vein. I respectfully **dissent**.

C.A.1 (Mass.),2001.
U.S. v. Nee
261 F.3d 79

### Briefs and Other Related Documents (Back to top)

• 00-2315 (Docket) (Nov. 01, 2000)
• 00-2037 (Docket) (Aug. 25, 2000)
END OF DOCUMENT

West Reporter Image (PDF)

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.